PEOPLE v FRAZIER (AFTER REMAND)

Docket Nos. 94507-94510. Argued March 8, 1994 (Calendar No. 1).
Decided August 29, 1994.

Omar Frazier, Christian Phillips, Darnita McGhee, and James
Robinson were convicted jointly by a jury in the Detroit Re-
corder's Court, Michael J. Talbot, J., of second-degree murder of
an off-duty state police trooper during an armed robbery. The
Court of Appeals, GILLIS, P.J., and MICHAEL J. KELLY and R. B.
BURNS, JJ., affirmed in an unpublished opinion per curiam
(Docket Nos. 102749, 102920, 103553, 104683). The Supreme
Court remanded the case to the Court of Appeals for reconsid-
eration in light of People v Banks, 438 Mich 408 (1991), and
People v Watkins, 438 Mich 627 (1991). 439 Mich 896-897
(1991). On remand, the Court, MACKENZIE, P.J., and MICHAEL J.
KELLY and WAHLS, JJ., reversed in an unpublished opinion per
curiam, finding that redaction of statements of nontestifying
codefendants was insufficient (Docket Nos. 147931-147934). The
people appeal.

In an opinion by Justice BRICKLEY, joined by Justices GRIFFIN
and MALLETT, and an opinion by Justice RILEY, joined by
Justice BOYLE, the Supreme Court held:

The introduction of the codefendants' statements, preceded
by a limited use instruction, did not violate the defendants'
right of confrontation. While some of the individual statements
introduced may have inferentially incriminated the other de-
fendants where those statements referred to others involved as
"friend" or "friends," the jury could have surmised that per-
sons other than those on trial might have been the friend or
friends referred to when considered in the context of the
evidence. Thus, the inference was not powerfully incriminating
and the jury could be presumed to have followed the limited
use instruction.

1. Statements made by codefendants are often suspect be-
cause the declarant is motivated to shift blame. A jury can
draw strong inferences even from a partially redacted confes-
sion if it is connected with other evidence at trial. Where there
is a substantial risk that the jury will consider a nontestifying
codefendant's statement in assessing the guilt of the defendant,

despite a cautionary instruction and despite partial redaction, such a statement is inadmissible because it violates the defendant's federal and state rights to confront the evidence through cross-examination.

2. The line between inferential incrimination and direct implication is thin. Drawing this line requires a careful examination of the specific details in each codefendant's statement, and analysis, in the context of all the evidence introduced, of whether the statement may have implicated any other defendants. In this case, when the evidentiary context, the manner of redaction, the nature of the statement, and the use of a cautionary instruction are considered, there was not a substantial risk that the jury utilized the nontestifying codefendants' statements in assessing the guilt of the other defendants.

3. It is improper for a prosecutor to infer that the jury can use the statement of a nontestifying codefendant to assess the culpability of a defendant. In this case, the prosecutor's closing argument was ambiguous and could have been considered an invitation to the jury to use nontestifying codefendants' statements to corroborate the statement made by a defendant. If there was a chance the jury might have been misled by the prosecutor, the harm was cured by the final instruction given by the judge.

4. The minimally redacted statements did not powerfully incriminate any particular defendant. The defendants were not named and any inference regarding identity was sufficiently attenuated to warrant confidence in the effectiveness of the limited use instruction. There was not a clear attempt to implicate one defendant, and the conviction of any one defendant did not hinge on an inference to be drawn from a nontestifying codefendant's statement. The statements did not supply missing elements or fill in any gaps necessary to convict any defendant. Rather, each defendant's statement established the elements necessary for conviction of second-degree murder on an aiding and abetting theory.

Justice RILEY, joined by Justice BOYLE, concurring, additionally stated that the "facially incriminating" test of admissibility for redacted confessions, as articulated in *Richardson v Marsh,* 481 US 200 (1987), should be adopted into Michigan jurisprudence.

Reversed.

Chief Justice CAVANAGH, joined by Justice LEVIN, dissenting, stated that there is a substantial risk that the jury considered the redacted codefendants' confessions in deciding each defendant's guilt. Moreover, the error in admitting the confessions

was not harmless beyond a reasonable doubt because an average juror would have found the prosecution's case significantly less persuasive had the confessions been excluded.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *John D. O'Hair,* Prosecuting Attorney, *Timothy A. Baughman,* Chief, Research, Training, and Appeals, and *Janet A. Napp,* Assistant Prosecuting Attorney, for the people.

*Craig A. Daly* for defendant Frazier.

*Daniel J. Rust* for defendant Phillips.

State Appellate Defender (by *Susan M. Meinberg*) for defendant McGhee.

*Robert M. Morgan* for defendant Robinson.

### AFTER REMAND

BRICKLEY, J. This Court is once again presented with the question whether the trial court erred in permitting the prosecutor to introduce into evidence at a joint trial the redacted statements of nontestifying codefendants where the jury was instructed that the statements be considered against the declarant only. Applying our ruling in *People v Banks,* 438 Mich 408; 475 NW2d 769 (1991), we hold that the introduction of the codefendants' statements in this case, preceded by a limited use instruction, did not violate the defendants' right of confrontation guaranteed by the US Const, Am VI and Const 1963, art 1, § 20.

Given the circumstances of this crime, we hold that the admission of the minimally redacted statements was not error. While some of the individual statements introduced may have inferen-

tially incriminated the other defendants where those statements referred to others involved as "friend" or "friends," the jury could have surmised that persons other than those on trial might have been the friend or friends referred to when considered in the context of the evidence. Therefore, the inference was not powerfully incriminating, and the jury in this case could be presumed to have followed the limited use instruction.

I

The four defendants were jointly tried for the shooting death of an off-duty state police trooper during an armed robbery outside a Detroit restaurant near the Detroit River at Hart Plaza. There was testimony at trial that established all four codefendants to be members of a gang known as the "Be Likes." All four defendants made at least one statement to the police. Each defendant admitted some complicity in the robbery, but each denied involvement in the actual shooting. Specifically, each defendant admitted to knowing that fellow gang members were going to commit a robbery and knowing that one fellow gang member had a gun. Each defendant stated that his role was to act as a lookout for police while the robbery occurred. All four defendants were convicted by a jury of second-degree murder. MCL 750.317; MSA 28.549.

Before this Court's decisions in *People v Banks, supra,* and *People v Watkins,* 438 Mich 627; 475 NW2d 727 (1991), the Court of Appeals affirmed the convictions of all four defendants[1] in an unpublished opinion per curiam, issued March 8,

_____

[1] We note at the outset that the statements were not used as substantive evidence against the codefendants, and the prosecutor has not contended that such use should have been permitted. In that regard *People v Watkins* is not applicable.

1990 (Docket Nos. 102749, 102920, 103553, and 104683). This Court ordered the Court of Appeals to reconsider the appeal in light of *Banks* and *Watkins.* 439 Mich 896-897 (1991). On remand, the Court of Appeals reversed defendants' convictions in an unpublished opinion per curiam, issued July 16, 1992 (Docket Nos. 147931-147934). We granted leave to appeal. 442 Mich 929 (1993).

II

A

Defendants' assertion of error requiring reversal is premised on the prosecution's use of the redacted statements of nontestifying codefendants, allegedly in violation of each respective defendant's right of confrontation under the Sixth Amendment of the United States Constitution[2] and under Const 1963, art 1, § 20.[3]

The right of confrontation insures that the witness testifies under oath at trial, is available for cross-examination, and allows the jury to observe the demeanor of the witness. *California v Green,* 399 US 149, 158; 90 S Ct 1930; 26 L Ed 2d 489 (1970). Recalling the origins of the Confrontation Clause, the Supreme Court noted:

---

[2] US Const, Am VI provides in pertinent part:

In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . and to have the Assistance of Counsel for his defence.

The Fourteenth Amendment makes this Sixth Amendment guarantee of the right to confrontation applicable to the States. *Pointer v Texas,* 380 US 400, 403; 85 S Ct 1065; 13 L Ed 2d 923 (1965).

[3] Const 1963, art 1, § 20 provides in part:

In every criminal prosecution, the accused shall have the right . . . to be confronted with the witnesses against him
. . . .

[T]he particular vice that gave impetus to the confrontation claim was the practice of trying defendants on "evidence" which consisted solely of ex parte affidavits or depositions secured by the examining magistrates, thus denying the defendant the opportunity to challenge his accuser in a face-to-face encounter in front of the trier of fact. [*Id.*, p 156.]

The Court in *Green* quoted *Mattox v United States,* 156 US 237, 242-243; 15 S Ct 337; 39 L Ed 409 (1895), for its historical view regarding the primary object of the Confrontation Clause and the role of the literal right to confront. The purpose of a right of a confrontation is to provide for

"personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." [*Green, supra,* pp 157-158.]

Addressing the issue of the use of a codefendant's unedited statement at a joint trial, the Supreme Court held in *Bruton v United States,* 391 US 123, 135-136; 88 S Ct 1620; 20 L Ed 2d 476 (1968), that it was error to allow the powerfully incriminating unredacted statement made by a nontestifying codefendant. Despite the cautionary instruction given by the judge that the statement should only be considered in evaluating the codefendant's guilt, allowing the jury to hear the facially incriminating statement violated the defendant's right to confront the witness. *Id.*

The *Bruton* Court observed that statements made by codefendants are often suspect because

the declarant is motivated to shift blame. *Id.,* p 136. In a joint trial, when a jury hears a codefendant's powerfully incriminating statement that expressly names the defendant and describes the defendant's role in the crime, the risk is that the jury will consider the codefendant's statement in assessing the guilt of the defendant despite an instruction telling it not to do so. *Id.,* pp 135-136. While limiting instructions avert the risk of improper consideration of evidence in many situations, in this context, human limitations would render the instructions ineffective.[4] *Id.*

In a plurality opinion, *Parker v Randolph,* 442 US 62; 99 S Ct 2132; 60 L Ed 2d 713 (1979), the Court later addressed the admission of a codefendant's facially incriminating statement in a trial in which the defendant had also confessed to essentially the same facts. Four of the justices were of the opinion that there was no violation of the Confrontation Clause in such a situation because the codefendant's statement did not have a devastating effect on the defendant's case. *Id.,* p 75. The plurality reasoned that where the defendant has already confessed, "[his] case has already been devastated . . . ." *Id.,* p 75, n 7.

Subsequently, the Court revisited the issue whether it was proper to allow the admission of a nontestifying codefendant's facially incriminating

---

[4] Justifying this exception to the general rule that juries are presumed to follow limiting instructions, the Supreme Court stated:

> [T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. [*Bruton, supra,* pp 135-136. Citations omitted.]

statement in a trial in which the defendant has also confessed and concluded the defendant's right of confrontation had been violated by the admission. *Cruz v New York*, 481 US 186, 192-194; 107 S Ct 1714; 95 L Ed 2d 162 (1987). The codefendant's unredacted statement was said to be "interlocking" in that it was similar in material respects. As such, it corroborated and confirmed the defendant's own statement so as to further implicate him.[5] *Id.*, p 192. Writing for the majority, Justice Scalia noted that the corroborative effect of an interlocking codefendant's confession could significantly harm the defendant's case, especially where a defendant seeks to avoid his own confession. The Court held that where the nontestifying codefendant's confession incriminates a defendant, it may not be admitted at their joint trial even if a limited use instruction is given and even if the defendant has confessed. *Id.*, pp 192-193.

The ruling in *Bruton* has subsequently been limited to situations in which facially incriminating statements made by nontestifying codefendants are used at trial. *Richardson v Marsh*, 481 US 200; 107 S Ct 1702; 95 L Ed 2d 176 (1987). In holding that there is not a violation of the Confrontation Clause where the name and the role of a defendant has been removed from the codefendant's statement, Justice Scalia wrote that "the calculus changes when confessions that do not name the defendant are at issue." *Id.*, p 211. Despite the redaction in *Richardson*, the statement contextu-

---

[5] The prosecutor in the case presently considered by this Court has asserted that there is no *Bruton* error because each defendant has confessed independently of enough to support the conviction of second-degree murder under an aiding and abetting theory. As noted by Justice Scalia, the fact of the defendant's own confession does not cure *Bruton* error; however, an independent confession might be relevant in assessing whether the error is nonetheless harmless. *Cruz, supra*, pp 193-194.

ally incriminated the defendant when linked to other testimony at trial.[6]

The Supreme Court distinguished the codefendant's facially incriminating statement in *Bruton,* from the redacted statement admitted in *Richardson.* The Court observed that the codefendant's confession in *Bruton* had expressly implicated the defendant. The confession it was considering in *Richardson* was incriminating only because the defendant's testimony made it so:

> In *Bruton,* the codefendant's confession "expressly implicat[ed]" the defendant as his accomplice. Thus, at the time that confession was introduced there was not the slightest doubt that it would prove "powerfully incriminating." By contrast, in this case the confession was not incriminating on its face, and became so only when linked with evidence introduced later at trial . . . . [*Richardson, supra,* p 208. Citations omitted.]

Absent the defendant's admission that she was in the car at the time the codefendant said he was discussing robbing and killing with a third person, there would not have been any incrimination with regard to her. In this context, the Supreme Court

---

[6] Specifically, the codefendant's statement in *Richardson* related a conversation between himself and a third person that allegedly took place in a car en route to the scene of the crime. The codefendant related that there was talk about having to kill the victims after the robbery. When the defendant testified, she admitted she was in the back seat of the car and she knew that the codefendant was involved in a conversation, but she could not hear what was being said.

To establish the defendant's knowledge of the criminal plan, the prosecutor suggested to the jury in closing argument that the defendant heard the conversation.

After the defendant unsuccessfully attempted to appeal the verdict in Michigan courts, unpublished opinion per curiam of the Court of Appeals, issued December 17, 1980 (Docket No. 46128), the Sixth Circuit Court of Appeals reversed the federal district court's denial of the defendant's petition for a writ of habeas corpus, Civ Action No 83-CV-2665-DT (ED Mich, October 11, 1984). 781 F2d 1201, 1212 (CA 6, 1986).

ruled that the jury could be expected to have disregarded the inferential incrimination when it convicted the defendant:

> Where the necessity of such linkage is involved, it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence. Specific testimony that "the defendant helped me commit the crime" is more vivid than inferential incrimination, and hence more difficult to thrust out of mind. Moreover, with regard to such an explicit statement the only issue is, plain and simply, whether the jury can possibly be expected to forget it in assessing the defendant's guilt; whereas with regard to inferential incrimination the judge's instruction may well be successful in dissuading the jury from entering onto the path of inference in the first place, so that there is no incrimination to forget. [*Richardson, supra,* p 208.]

Left unanswered by the Supreme Court is whether the statements of codefendants may be sufficiently redacted when neutral nouns or pronouns are substituted for named defendants. The question is whether leaving the role played by the defendant intact violates the standard set forth in *Bruton, supra.*[7]

**B**

This Court has considered partially redacted statements made by nontestifying codefendants to be "powerfully incriminating" where the name of the defendant was blanked out, but the evidentiary context in which the statement was introduced made it easy for the jury to infer the defen-

[7] The Supreme Court did not express an opinion regarding whether a nontestifying codefendant's confession in which only the name of the defendant had been redacted would be admissible. *Richardson, supra,* p 211, n 5.

dant's identity. *People v Banks, supra.* "[A] jury
can draw strong inferences even from a partially
redacted confession if the confession is connected
with other evidence at trial." *Id.,* p 419. This Court
set forth a case-by-case approach rather than a
rule of admissibility per se. "[T]he ease with which
a jury will be able to fill in a blank will vary from
case to case, depending upon the overall eviden-
tiary context in which it is introduced to the jury."
*Id.,* p 420. Where there is a "substantial risk" that
the jury will consider the nontestifying codefen-
dant's statement in assessing the guilt of the
defendant, despite the cautionary instruction and
despite the partial redaction, such a statement is
inadmissible in that it violates the defendant's
federal and state rights to confront the evidence
through cross-examination. *Id.,* pp 420-421.

In order to determine whether there is a sub-
stantial risk that the jury will consider the non-
testifying codefendant's statement when assessing
the defendant's guilt, other independent evidence
presented at trial necessarily must be considered.
In *Banks,* the two codefendants' statements both
asserted that a third person had taken a gun and
that that person did not return until after the
codefendants heard shots. We ruled that the redac-
tion was transparent. With three people on trial,
there was no doubt about the identity of the
unnamed person. "The defendant rightfully com-
plains that he might as well have been mentioned
by name . . . ." *Id.,* p 423.

The defendant's conviction included first-degree
murder. The codefendants were acquitted of all
counts. The defendant was denied the opportunity
to cross-examine and challenge the codefendants
statements of self-exoneration that identified him
as the person who fired the gun. We held that the
*Bruton* violation was not harmless because the

statements provided a critical element of the prosecutor's case and "[t]here [was] a very real possibility that the improperly admitted statements swayed the jury." *Id.*, p 430.

C

We now turn to the application of the test enunciated in *Banks* to the specific facts and circumstances of the case before us to determine whether the codefendants' statements were sufficiently redacted. In *Banks,* we observed that the line between inferential incrimination and direct implication is thin. *Id.*, p 419. Drawing this line requires a careful examination of the specific details disclosed in each codefendant's statement and analysis of whether the statement may have implicated any of the other defendants when the context of all the evidence introduced during the trial is taken into consideration.

The prosecution presented the testimony of several eyewitnesses who were at Hart Plaza that evening. Basically, those witnesses testified that they heard the sound of a gunshot, followed by the scream of a woman. A man was slumped on the sidewalk and bleeding from the head. The witnesses observed several black youths running from the plaza. The description of the clothing worn by those fleeing was generally vague. Some said dark clothes and jeans. Others described Addidas tee shirts, and gym shoes. One of the fleeing youths was thought to have been wearing a baseball cap. One witness described those fleeing as wearing jackets, another said they wore jogging outfits.

The woman who accompanied the victim that evening testified that after they left the restaurant, they were followed by two black males. She described one as wearing a baseball cap. The cou-

ple kept walking. The victim put his hand on her back for her to walk a little faster. He switched positions so that she would be walking on the inside. The two assailants overtook them on the right side. One had a gun and asked them for their wallets and money. The victim turned over his wallet. The assailants asked the witness for her wallet. The victim told them she did not have any money with her because she did not bring her purse. The assailants then directed the couple to an area where they were to get face down on the ground. As the couple started in that direction, one of the assailant's asked the victim if he had another wallet. The victim replied that he did. The witness testified that the victim pushed her to the ground, took a step back, and identified himself as "police." The witness covered her head. She did not see the victim draw his weapon. She heard a gunshot and looked up to see the victim on the ground, blood surrounding his head. She remembers someone coming to her aid, and she remembers pointing in the direction that the assailants ran. She testified that she had not been able to identify the assailants at the police lineup, nor could she testify at trial that any of the four defendants were the two assailants she saw that evening.

Nine witnesses who were either gang members or somehow associated with gang members at the time of the crime testified about the activities of the "Be Likes." A primary action of the gang was "getting paid," a euphemism for robbing people of money or valuables. There was testimony that the gang primarily worked the downtown area of Detroit, concentrating on the area in the vicinity of Hart Plaza. There was further testimony that many of the gang members dress in dark Addidas tee shirts, jeans, and gym shoes. Fellow gang

members not on trial testified that all four defendants were generally known to be members of the Be Like gang.

Regarding the day in question, gang members not on trial also testified about the presence of somewhere between twenty and fifty gang members downtown in the Hart Plaza area. Various testimony established that the roster of gang members present in the Hart Plaza area on the day in question included: Bop, Al, Shawn, Tyrone, Tina, Mary, Cocoa, Mike, Terrence (Red), Andre, Reuben, Monica, Deno, Darryl, Anthony, Jonathan (Rabbit), Calvin, Lamont, Tim, Larry, Sonya, and the four defendants. There was general testimony that the discussion centered on "getting paid" that night. One gang member, its leader, testified that he and defendant Robinson discussed getting $1,000 together to purchase drugs that could be resold.

Another gang member testified about seeing the four defendants walk toward the boat restaurant. Still another gang member testified that she had seen defendant Phillips with a gun that night. Juxtaposed was testimony that there were other gang members not on trial but present at the plaza who also had guns on the day in question. Several sworn statements previously made by testifying witnesses that implicated various gang members not on trial as the shooter were introduced at trial.

The redactions in this case were minimal. A variation of the term "friend" was substituted for the name whenever the reference was pejorative to someone other than the declarant. Sometimes there was a reference to the number of friends. The codefendant's names were never used, but the names of other gang members were not deleted if the references were benign.

After hearing a cautionary instruction from the judge, the minimally redacted statements were introduced. The jury was advised that names had been redacted, but that the names struck did not necessarily reflect the individuals on trial and the jury was told it should not speculate regarding identities.[8] Contrary to the characterization suggested in the dissenting opinion, the jury was never instructed that "friend" inevitably meant

---

[8] During his testimony the police officer who interviewed defendant Robinson was asked by the prosecutor if he had a copy of Robinson's statement with him that had been marked in some way to delete some names. After the witness responded yes, the trial judge gave the following instruction:

*The Court:* What I have done ladies and gentlemen, if you think back when we first started this trial, I indicated to you, obvious to you that you could observe there are four individuals on trial here and that each individual deserves your respective judgement as to the proofs or lack of proofs.

In other words each person is entitled to your separate consideration. Along with that we utilize and this goes along with any statement that the people may make, the first rule of the juror is to determine whether or not they made the statement and if in fact in point of fact they made it, only so much as you believe was made can be used against them. That's kind of logical.

What I have ordered the prosecutor to do is to use a fancy lawyers phrase, redact, strike, scratch out. This is going to be done all afternoon.

Any statement other than [what] is applicable to that individual, if they make any reference to any other names, I said strike it out. I don't want you to guess or speculate, don't consider or worry about it. This is utilized and designed to have you focus first of all whether or not they made the statement and also secondly only as it applies to that individual, if you believe they made the statement and how much of it they made.

You are going to hear a phrase called my friend. There is [sic] a lot of different names. Don't worry or speculate or my friends, plural if there are more than one person. Okay, all right.

[*Prosecutor*]: Thank you your Honor.

*The Court:* Understand I meant to say this too, the names struck do not necessarily even reflect the individuals on trial here; but I'm doing this so that you can better focus on it.

"blank." While the word "friend" may have signaled a redaction, it may also have been the word actually used in the statement, leaving the person referred to unnamed. However, we do acknowledge that telling the jury of the fact of redaction necessarily invokes curiosity and speculation despite a cautionary instruction. For this reason, it may have been preferable for the judge not to have advised the jury of the fact and manner of redaction.

Defendant Robinson's first statement was taken on September 17, 1985. The following excerpts exemplify the presentation and demonstrate the inability of the jury to identify any given codefendant on the basis of the overall nature of the testimony at this trial:

> "[*Officer*]: Tell me what you have heard about the shooting of the state trooper in Hart Plaza?
> "[*Robinson*]: On Saturday, August 31, the crew was walking on Woodward near the Hudson store when the cops stopped us and one of them slapped Mike and he said, 'If I had my piece I would have popped him.' I [s]aid I know they are going to be hard on us because that cop got shot down on Hart Plaza. Mike said I know who shot him and I said who and he said Rabbit. (Jonathan Cox) (Mike is Michael Gregory).
> "*Q.* Did you ever talk to Rabbit about him being involved in the shooting?
> "*A.* Yes. I asked him and he said he didn't do the shooting but he was there. I asked what happened and he said we stuck up a cop. He said we stuck him up. We asked him for his wallet and the man gave him the wallet then Rabbit asked him for his second wallet. The man then pushed the lady aside and identified himself as a cop and went for his gun and the boy shot him.
>
> * * *
>
> "*Q.* Did you talk to anyone else about the shooting?

"*A.* Yes, I talked to Al. Al is 17 to 19 about 145, brown skin, mustache, bushy hair, wears a [burgundy] and white hat.

"*Q.* What did Al tell you?

"*A.* He said Rabbit didn't shoot the cop, I did. I didn't believe him and told him and he called over a tall black dude over and said who shot the cop and this dud[e] said Al did. He said when he stuck him up he asked for his wallet and the guy gave him the wallet, the guy pushed the lady aside, identified himself as a cop and reached for his gun. I didn't ask him who he was with because I figured it was the black dude he was with. I asked him how did you get out of down town so quick and he said they ran across the street where Mayor· Youngs office is near the Greyhound is and jumped in a cab. I don't think either one of them did it.

"*Q.* Why don't you believe them?

"*A.* If a real Be Like would have done this they wouldn't be bragging and telling everyone.

"*Q.* Has any of the Be Like boys robbed people near the water?

"*A.* We all have done that. We sit on the water and look like we are with a girl or just looking at the water and then when people come out of the restaurant and go to the car a couple of us will follow them and then stick them up."

The following statement, taken from defendant McGhee, was introduced at trial in the same minimally redacted form:

"Some time around 3:00 P.M., or 3:30 P.M., on August 29, 1985, I was at Farastina Collins house at 8075 Marcus. Cocoa and Mimi came into the house and asked me if I wanted to go downtown. Farastina wasn't able to go downtown that day so me, Mimi and Cocoa got on the Van Dyke bus and went downtown. We got off the bus at the main bus stop. We walked around and shopped on Woodward and went to the Ren Cen and finally ended up at the Hart Plaza. I saw a lot of the Be Like

group at different times. I remember that security ask [sic] me and three others to leave the Ren Cen because we were being too loud that afternoon. When the sun was going down I was back at the main bus stop with all the Be Like. There was me, and Shawn and Mary and Cocoa and Bop and [T]ony and three others I knew and some other I just knew to see. There was a lot of talk by Bop and one other person about getting paid that day. A third person was talking about getting paid too. Then me and Tony and Shawn and Mary and Cocoa and three others walked through the Greyhound bus station . . . and at[e] a little at the Burgerking. It was dark as we left the Greyhound Station and when we got out of the station we went on to the Hart Plaza to get paid. I forgot to say that one of my friends showed us a black handgun, it was a revolver and I said damn, that is a big ass gun and my friend didn't reply to that. I think my friend had a jacket on because I remember he put the gun in his waist band. When we got to Hart Plaza everyone kind of split up and walked around and Mimi and Cocoa was coming up the stairs closer to Ford Auditorium and I bumped into Mimi and we argued about that. We all met up again at the spiral seats. [T]he talk again was about getting paid. One of my friends told Shawn, you go with them, indicating the girls. And Shawn got mad. There was me and Tony and Cocoa and Mimi and Shawn and three others. One of my friends got real mad and slapped Shawn because she wanted to be with him when they got paid. Cocoa started to calm Shawn down because she was hysterical. I don't know who had the gun at this time. One of my friends had a bag, I think it was a designer bag, but I don't know if the gun was in the bag. We all walked towards the boat restaurant and they wouldn't let us on the boat. We walked back towards the spiral seats. Me and two of my friends kind of held back around the basketball game and the others went on towards the fountain area. One of my friends said look out for hook and I stood about ten feet from the

basketball game towards the fountain and watched for the police. I heard one of my friends say something and a few seconds later a gun went off. I was watching for the police. I could see Cocoa, Shawn and Mimi near the spiral seats and Tony was further towards Ford Auditorium. Soon as the shot went off I looked towards where two of my friends were near the basketball game and I saw a white guy in front of one of my friends and the other friend was starting to move towards me. I didn't see the gun. One of my friends yelled hook, everyone get the hell out of here. We were all running towards Jefferson. Tony and one of my friends changed coats. Tony gave my friend his blue Georgetown coat and my friend gave Tony his white Georgetown coat. I ran on with Tony to the main bus stop where we caught the Van Dyke bus after ten or fifteen minutes. Mimi and Cocoa were at the bus stop when Tony and I got on the bus.

"Q. What are the real names of Cocoa, Mimi, Shawn and Tony and our three friends?

"A. Mimi is Mary, Shawn of Antoinette Simmons, Tony is Anthony Quarles. I don't know Cocoa's real names.

"Q. What do you mean when you say getting paid?

"A. Do stick-ups, robberies, snatching gold and stuff like that.

"Q. When the shot went off where was one of your friends?

"A. I know that one of my friends was with us as we returned from the boat restaurant and I didn't see him in the fountain area when the shot went off. I can't say how close to the shot he was. I didn't see him except at the bus stop after the shooting. He must have been looking for hook behind me.

"Q. What is hook?

"A. The police.

"Q. Was there anyone else downtown you forgot to mention?

"A. Yes, a short, lightskinned short hair guy

they call baby boy. He would hang with one of my
friends a lot. The last time I remember seeing him
that day it was [s]till light. I don't know where he
lives. He used to be with his baby brother a lot."

Defendant Frazier gave a statement to police on
December 18, 1986, which was read to the jury,
redacted as follows:

"About 9:30 P.M., on August 29, 1985, I was [at]
the Hart Plaza and met up with members of the
Be Like gang around the spiral cement area. I met
up with eight or nine other persons. One person
had a Gucci bag I had sold him earlier and he had
a blue steel revolver in the bag. I could see the
handle of the gun because he was acting tough and
showing it off. Two of the persons were talking
about getting paid. One person mentioned going to
the boat restaurant to get paid, so we started
moving through the crowd towards the boat res-
taurant. When we finally got to the boat restau-
rant there was six of us. We had tennis shoes on
except for one person so only he could go onto the
boat. He went onto the boat and came back off. He
said the boat was nice inside. All six of us started
moving back up towards the games. I played the
basketball game for a dollar and missed. The guy
started closing the game up. I moved to the ball
toss color booth and asked the girl if we could go
out and she said, hold up, so I went and set [sic]
down at a bench on the grassy area. I was looking
for two of my friends. They and a third person had
made it to the doll game and were standing there.
One of the others was still at the ball toss color
booth. One of my friends moved towards where I
was and the girl from the ball toss came and
joined me. I think her name was Cindy or Cynthia
but I'm not sure. I was acting as lookout for two of
the others, looking towards the boat area. I was
watching for the police so I could warn them if I
saw police. One of the others was looking towards
the fountain way so if any police came from that
way that person could yell. A white couple,

dressed nice, were walking from the boat and when they got to about the doll booth, two of my friends moved towards them and one of them unzipped the bag and put his hand in and was standing in front of the couple. I heard the white guy say, 'What's the problem?' and one of my friends said, 'Check it in' and the guy said 'Check what in?' and my friend said 'The wallet' 'And I want her money too.' My other friend took the gun out and pointed it towards the white guy and my first friend pulled the guys wallet out, opened the wallet, took out the money and put it in his pocket. My friend looked at the wallet and then acted surprised and my other friend looked at the wallet. One of my friends shot one shot at the white guy. My other friend tossed the wallet over the rail onto the grass. The white lady screamed for help and the white guy fell to the ground next to the game. One of my friends yelled to run and everyone took off. Two of my friends ran towards the fountain area and one ran towards the river. The girl I was with took off. I don't know where another friend was at the time of the shooting and didn't see him again till later, two days later. I walked towards Jefferson and was stopped by a plain clothes officer at the path that goes to Ford Auditorium and he checked me for a gun and asked for my name. Some uniform officers took me to the mini-station and called my mother and then let me go."

Defendant Phillips made one statement to the police. It was similarly redacted and introduced against him:

"Just before Labor Day, I think it was on Thursday in August 1985, I road [sic] a bus downtown to the festival. Where I got off the bus on Woodward just before Jefferson. At the bus stop I saw three people I knew. All four of us went over to the festival area. This was around 10:30 P.M. We went to the basketball booth . . . . I was shooting baskets and one of my friends said, let's stick some-

body up off the boat. I shot some more and then two people were coming up the walk towards where we were. It was a white man and a white woman that were talking [sic] towards us from the boat restaurant. One of my friends pulled out the gun and said to the white guy, give me your wallet. I was standing by the basketball booth looking for any police and one of my friends was at the other end of the booth, just standing there. The white man and woman were past me towards the second booth and two of my friends was at the other end of the booth just standing there. The white man and woman were past me towards the second booth and two of my friends were in front of them and one had the gun. I was looking around; but I think the man resisted and I heard a shot go off from my friend's gun. The man stood and stumbled for a second and then fell to the ground. I started to run with my three friends towards the fountain area. I took off my shirt and put it in one of my friend's Gouchi [sic] bag I was holding and one of my friends put his shirt in the bag and one of my friends had on about four shirts so he gave me and another friend a shirt and he threw one down when we reached the City County Building. My three friends and me ran to the bus stop on Woodward where I had met them that night and we all got on a bus except one of them. One friend got off somewhere around East Grand Boulevard and we changed to a different bus without him. Me and one friend went to a girl named Kelly house in Hamtramck and we stayed for a few minutes and left. We got onto a different bus and I got off at Six Mile an[d] Livernois and my friend got off and caught the Livernois bus to his sisters house. He still had the gun. . . . I walked home."

In a subsequent statement made by defendant Robinson to police on the evening of October 10, 1985, he admitted greater culpability than he originally acknowledged. The minimally redacted statement was read to the jury to be considered

against defendant Robinson only. The following
exemplifies what was stated:

"[*Officer:*] Okay, start from the beginning and
tell me everything you know about this case.

"[*Robinson:*] I got downtown around about nine
in the morning. Around about four thirty or five,
that's when everybody started meeting up. It was
Cocoa, Me, Bop, two girls, Cocoa and Shawn and
two other friends. It was some more Be Like down
there but they was just down there, it was just me,
Cocoa, Shawn, Bop and three other friends. Cocoa
and Bop had took a mans change and money
earlier that day. We started walking towards
Greek Town and after that we left Greek Town
and went towards the Renaissance. Then we just
kept walking towards the festival people had
dulled off and by the time we got to the festival it
was just four of us, three friends and me. We went
downstairs first, then we came back up to the
waterfront and we was standing there for a while.
Then we went up towards the boat, we was all
waiting at the walkway by the boat. We was
thinking about sticking up a couple that came out
of the boat. A couple of couples came out but they
left them pass and then the cop came out and they
went up that little walkway. Two of my friends
was behind them, I was already up front. I walked,
I had walked up to the top of the walkway. In the
middle of the walkway my two friends had passed
the couple and at this time everybody had made it
up to the walkway. Then about two or three
games, once the couple passed about two or three
games, that's when the incident took place, the
shooting. At the same time my third friend was
still at the bottom and I was still at the top. Then
the gun went off and everybody started to run.
That was it. Until one of my friends called me a
day later and told me he wanted me to hide him
out and that was the last time I heard from him,
until he went to jail.

"*Q.* Give me the full names of the four people
that were involved in the robbery?

"*A.* I don't know full names.

"*Q.* Okay, was there some discussion about robbing somebody prior to the time the officer was shot?

"*A.* Did we talk about it, yes.

"*Q.* What was said?

"*A.* That everybody was gonna get paid.

"*Q.* Did someone have a gun?

"*A.* One of my friends.

\* \* \*

"*Q.* Who took the mans wallet?

"*A.* I wasn't up where I could see who he gave it to, all I seen him reaching and handing, I believe he gave it to one of my friends[.]"

Defendants have alleged that any reference to friends, especially when the reference is my three friends or the four of us, left the jury with no choice but to substitute the three codefendants for any reference to the word friends. Their position is that the jury was invited to identify one of the defendants whenever the word friend or friends was used.

In reversing the defendant's conviction on remand, the Court of Appeals found the redaction to be insufficient. It expressed the view that by leaving the roles of the other defendants in the nontestifying codefendants' statements, the jury would assume "three friends" in the statement referred to the three other defendants on trial:

The fact that there were four defendants on trial, the fact that there were four confessions read to the jury, and the fact that some of the statements were redacted by replacing the codefendants' names with "my three friends," leads us to believe that there was a substantial risk that the

jury, despite instructions to the contrary, looked to the codefendants' confessions in determining each defendant's guilt.

We disagree.

*Banks* calls for case-by-case analysis to determine whether a statement in which the names have been redacted is as powerfully incriminating as a statement in which the names are left intact. In many cases the circumstances of the crime will be such that a redaction substituting the word friend for the named defendant will be insufficient because no imagination will be necessary for the jury's conclusion that the word friend in the codefendant's statement refers to the defendant. However, in this case, the jury could not have easily concluded that out of the array of fellow gang members who were in the immediate vicinity of the crime, the declarant was referring to one of the defendants whenever the word friend was used in the statement.

Witness Labron Moore testified that he was generally regarded to be the leader of the Be Likes at the time this crime took place. He stated that when he left Hart Plaza that night ten to twenty gang members were with defendant James Robinson. Witness Lacoya Huff testified that Antoinette and Al were present. Witness Darryl Mainor indicated that Tony Wright, Jonathan Cox, Terrence Judkins, Calvin Dodo and five others he did not name were in the immediate vicinity of the crime.

It is not disputed that the jury could have inferentially linked one or all of the defendants whenever the word friend or friends was used in a codefendant's statement, but the degree of inference required is sufficiently attenuated that the cautionary instruction can be presumed to have

been effective.[9] When the evidentiary context, the manner of redaction, the nature of the statement,

---

[9] The dissenting opinion points out the danger that defendant Robinson was linked to the statements made by codefendants because of references to one friend having a Gucci bag, slapping Shawn Simmons, and taking the Livernois bus to his sister's house.

There was testimony from Labron Moore, the supposed leader of the Be Like gang that a couple of gang members carried designer bags. Witness Andre Quarles testified that Tony and Edward also carried guns. Witness Debbie Scruggs testified that defendant Robinson had a Louis Batton pouch that night (not a Gucci bag). Codefendant Phillips asserted in his own statement that he was holding his friend's Gucci bag that night, and defendant Robinson said in his statement that one friend put the gun back into the other friend's bag before the group got onto the bus. Witness Antoinette Simmons testified that defendant Robinson carried a Gucci bag that evening, but, as the dissent later notes, her testimony was so severely impeached, it was virtually unbelievable. Given the contradictory evidence, any link between the reference to the Gucci bag in the statement to defendant Robinson was sufficiently attenuated. The jury could not *easily* substitute Robinson for "friend," and therefore the cautionary instruction can be considered to have been effective.

The statement in the dissenting opinion that the jury could have guessed that the friend that took the Livernois bus to his sister's house was defendant Robinson is not the equivalent of establishing that the risk is too high that it would be easy for the jury to draw that conclusion. Even if there is some link to some aspect of a statement, there is not necessarily a link to the criminal activity in every case. The prosecutor, who is asking to use the redacted statement in a joint trial in which the codefendant's right to cross-examine the evidence may be violated when the defendant exercises his right not to testify, is in the best position to know the entire evidentiary picture and suggest a redaction sufficient to protect the codefendant. An edit that allows the jury to easily fill in the blanks will carry with it the risk of being so judged on appeal.

Here, not all the gang members who were downtown and who fled were involved in the robbery and shooting. Defendant Robinson's sister testified her home was on Willett. Given the number of the members downtown who fled after the shooting, it would not have been easy for the jury to conclude the friend taking the Livernois bus was defendant Robinson. More than one gang member lived in that area of Detroit, and it is likely that more than one could have lived with a sister.

Finally, whether or not defendant Robinson slapped his then girlfriend Antoinette Simmons earlier in the evening was not a fact central to establishing defendant Robinson's guilt in the armed robbery and murder of the state trooper. Defendant McGhee's statement tells the chronological story of the events of the evening. Beyond repeating the word friend, defendant McGhee does not state any further reference to the "friend who slapped Shawn," which would have impermissibly incriminated defendant Robinson in the crime.

and the use of a cautionary instruction are all considered, there was not a substantial risk that the jury utilized the nontestifying codefendants' statements in assessing the guilt of the other defendants.[10]

### III

Defendants assert that prosecutorial misconduct occurred during closing argument. The defendants' position is that the effect of the prosecutor's closing argument was to undermine the protection afforded by the cautionary instruction given by the judge when the statements were introduced. Defendants characterize the words used by the prosecutor as an invitation for the jury to improperly link all of the defendants' statements.

It is improper for a prosecutor to infer that the jury can use the statement of a nontestifying codefendant to assess the culpability of a defendant. *Banks, supra,* p 426. In *Banks,* the prosecutor urged the jury to use the nontestifying codefendants' statements to evaluate the defendant's case. *Id.,* p 424.

Each statement was properly admissible against the declarant, and it was therefore permissible for the prosecutor to comment that each defendant put himself at the crime scene and acknowledged some involvement in the armed robbery. A careful examination of the record in this case has revealed that the prosecutor's closing argument could have been considered an invitation to the jury to use

---

[10] The dissent maintains that it was obvious any reference to "friend" in the redacted statements meant one or all of the codefendants. Interestingly, this trial represents a situation in which the statements become less incriminating when the evidentiary context is considered. Our review of the entire record suggests that only gifted jurors armed with graph paper, a computer, and instructions regarding which testimony to consider credible and which to disregard would be able to draw the conclusion that friend meant codefendant.

nontestifying codefendants' statements to corrobo-
rate the statement made by a defendant. The
prosecutor's closing argument included the follow-
ing remark:

> In this case when you compare the statements of
> each of these defendants, even with all the differ-
> ences in the details, I believe you will conclude
> that you got the truth.[11]

Defense counsel raised an objection to the pros-
ecutor's argument, which he characterized as an
invitation to consider the defendants' statements
as a whole. The trial judge responded that his view
of the prosecutor's comments was not that the jury
had been invited to match up each defendant's
statement with that of the codefendants. His view
was that the prosecutor had invited the jury to
compare each defendant's statement with the
other evidence introduced in the trial in order to
evaluate that statement's credibility vis-à-vis eval-
uating the guilt of the declarant. The judge did,
however, readvise the jury in final instructions
that each defendant's case should be determined
on the basis of the defendant's acts and state-
ments.

---

[11] Similarly, the following argument made by the prosecutor was
also cited by the defendants as illustrating the prosecutor's invitation
to the jury to use codefendants' statements to evaluate the guilt of
the other defendants:

> But probably the best evidence of the truth of any part of
> Shawn Simmons statement is the testimony of other defendants
> and other witnesses. The defendants corroborate the same
> things that Shawn puts in her statement and puts in her
> testimony.

Shawn was one of the fellow gang members not on trial who
testified as a witness for the prosecution. This is not necessarily a
specific directive to compare codefendants' statements with one an-
other. Each defendant's statement did include references that argu-
ably corroborated the testimony of the witness.

If there was a chance the jury might have been misled by the prosecutor's choice of words, the harm was cured by the final instruction given by the judge. The jury's conviction of second-degree murder supports our conclusion that it was able to heed the limited use instruction.

IV

In conclusion, the minimally redacted statements introduced in this case did not powerfully incriminate any particular defendant. The defendants were not named, and any inference regarding identity that could be drawn was sufficiently attenuated to warrant confidence in the effectiveness of the limited use instruction.

Unlike *Banks,* there was not a clear attempt on the part of the prosecutor to implicate one defendant as the person who shot the victim. The conviction of any one defendant did not hinge on an inference to be drawn from a nontestifying codefendant's statement. The statements did not supply missing elements or fill in any gaps necessary to convict any defendant. There was no suggestion that there would have been insufficient evidence to support a conviction had each defendant been tried separately. None of the defendants was singled out by the jury to be convicted of the first-degree murder charge brought against each of them. Each defendant in his own statement established the elements necessary for the jury to convict him of second-degree murder on an aiding and abetting theory.[12]

---

[12] Even if we were to accept the position of the dissenting opinion, that it was error for the redacted statements to have been allowed, the harmless error analysis employed in that opinion appears to ignore each defendant's admission that is admissible against that defendant.

Having resolved this case on the inquiry into whether the redacted

We therefore reverse the decision of the Court of Appeals in these cases and affirm the defendants' convictions.

GRIFFIN and MALLETT, JJ., concurred with BRICKLEY, J.

RILEY, J. (*concurring*). I completely agree with the majority's analysis under the test of admissibility formulated by a majority in *People v Banks,* 438 Mich 408; 475 NW2d 769 (1991). I write separately to indicate my continued belief that this Court should adopt the "facially incriminating" test for redacted confessions as provided by a majority of the United States Supreme Court in *Richardson v Marsh,* 481 US 200, 209; 107 S Ct 1702; 95 L Ed 2d 176 (1987). See *Banks, supra* at 436-447 (RILEY, J., dissenting). While the majority of this Court in *Banks* adopted the reasoning of Justice Stevens' dissent in the *Richardson* case, I noted in my dissenting opinion in *Banks* that the federal courts have had no problem applying the "facially incriminating" test advocated by the *Richardson* majority. *Banks, supra* at 444-445. See also, e.g., *United States v Gio,* 7 F3d 1279, 1287 (CA 7, 1993).

BOYLE, J., concurred with RILEY, J.

CAVANAGH, C.J. I respectfully dissent.[1] The record in these cases reveals that a substantial risk

statement was powerfully incriminating, we leave for another day the interplay between the magnitude of incrimination and harmless error, including the role of a defendant's own confession in the harmless error analysis.

[1] I have previously voiced my dissatisfaction with name-only redactions and the importance of the Confrontation Clause. See *People v Banks,* 438 Mich 408; 475 NW2d 769 (1991) (CAVANAGH, C.J., concurring), and *People v Watkins,* 438 Mich 627; 475 NW2d 727 (1991) (lead opinion by CAVANAGH, C.J.). Although I still believe in the correctness of those opinions, I see no need to reiterate those positions here.

exists that the jury considered the codefendants' confessions when deciding each defendant's guilt. Moreover, the error in admitting these confessions was not harmless beyond a reasonable doubt because the mind of an average juror, indeed, would have found the prosecution's case significantly less persuasive had the codefendants' statements been excluded. Accordingly, I would affirm the decision of the Court of Appeals.

I

As the majority correctly recognizes, the analysis in these cases is governed by *People v Banks*, 438 Mich 408; 475 NW2d 769 (1991). While reasonable minds may differ on the application of *Banks* to these facts, they certainly cannot differ on the rule of law established in *Banks*.

> In cases such as the one before us now, where redaction is achieved through replacement of the defendant's name with a neutral pronoun or "blank," the ease with which a jury will be able to fill in a blank will vary from case to case, depending upon the overall evidentiary context in which it is introduced to the jury. . . .
>
> We therefore return to the basic tenets of *Bruton* [v *United States*, 391 US 123; 88 S Ct 1620; 20 L Ed 2d 476 (1968)]. Because codefendant statements are *"inevitably suspect"* because of the strong potential for blame shifting, *Bruton, supra,* p 136, even redacted confessions like the one challenged here should be clothed with a *presumption of unreliability.* If a *"substantial risk"* exists that the jury, despite cautionary instructions, will consider a codefendant's out-of-court statement in deciding the defendant's guilt, the statement— even though redacted to delete the defendant's name—will be rendered inadmissible at a joint trial. Other independent evidence may, by neces-

sity, have to be considered . . . . [*Banks* at 420-
421. Emphasis added.]

The theoretical underpinning of *Banks* is the
questionable reliability of codefendants' confes-
sions. When one person accuses another of a crime
under circumstances in which the declarant stands
to gain by inculpating others while at the same
time exculpating himself, the accusation is *pre-
sumptively* unreliable and *must* be subject to
cross-examination. *Banks* at 427-428. However, it
seems that the majority today overlooks this pre-
sumption of unreliability and the corollary pre-
sumption against admissibility of such accusations
in the absence of cross-examination.

A

The central issue in these cases is determining
the ease with which the jury was able to fill in the
"blanks" in the redacted statements, given the
entire evidentiary context of the case. In determin-
ing this issue, it is incumbent on us to

careful[ly] examin[e] . . . the specific details dis-
closed in each codefendant's statement and
analy[ze] . . . whether the statement may have
implicated any of the other defendants when the
context of all the evidence introduced during the
trial is taken into consideration. [*Ante* at 550.]

After conducting its examination of the redacted
statements, the majority concludes that the jury
could not have filled in "friends" or "my three
friends" with the defendants' names. The "jury
*could* have surmised that persons other than those
on trial *might* have been the friend or friends
referred to when considered in the context of the
evidence" because so many gang members were

named at trial. *Ante* at 542 (emphasis added). I agree that the jury *could* have believed that the "friends" referred to were persons other than the codefendants. However, given the entire evidentiary context of the trial, there is a substantial risk, bordering on virtual certainty, that the jury *did* conclude that a reference to "friend" or "my three friends" was a reference to a codefendant.

As the majority correctly notes, no less than twenty gang members, other than the four defendants, were named at trial. All of these were present in downtown Detroit at some point on August 29, 1985. It is important to remember, however, that the significant events of this crime did not occur during a twenty-four-hour period. They occurred within about a five- to ten-minute period sometime between 10:30 and 11:00 P.M. In addition, most of the people mentioned at trial as being present at various times that day were excluded from being present at the critical moment when the victim was fatally shot.

For example, two of the prosecution's primary gang witnesses established that, at most, there were eight to ten gang members present at Hart Plaza at the time of the shooting, and, of these, only the four defendants actively participated in the robbery and shooting. The first of these witnesses was Mary Walker, also known as "Mimi," who gave the following testimony concerning the events that occurred just before the shooting:

> [*Assistant Prosecutor Foley*]: Who were you down there [Hart Plaza] with?
> [*Mary Walker*]: Lacoya, Shawn and Omar, Neeta.
> *Q.* I'm sorry, down with Lacoya and Shawn and Omar?
> *A.* Yes.

*Q.* Omar Frazier?

*A.* Frazier.

*Q.* And Darnita?

*A.* Yes.

*Q.* And who else?

*A.* James and Chris.

*Q.* You mean Chris Phillips?

*A.* Yes.

*Q.* And James Robinson?

*A.* Yes.

\* \* \*

*Q.* Was anyone talking?

*A.* Yes.

*Q.* And who was talking?

*A.* James.

*Q.* James was talking. What was he talking about?

*A.* Getting paid.

*Q.* Getting paid?

*A.* Yes.

\* \* \*

*Q.* Did he [James] say something after that?

*A.* He asked was anybody going with him.

*Q.* All right. And what happened after he said that?

*A.* They left.

*Q.* Who left?

*A.* Chris, Omar and Darnita and James.

*Q.* Do you remember how James was dressed that day?

*A.* Yes.

*Q.* How was he dressed?

*A.* A white jogging suit.

*Q.* Was he carrying anything?

*A.* Yes.

*Q.* What was he carrying[?]

[*A.*] A Gouchi [sic] bag.

*Q.* A Gouchi bag. Was anything in the Gouchi bag?

*A.* I don't know.

\* \* \*

*Q.* All right. Did you se[e] them as they walked towards the boat?

*A.* I didn't pay no attention then after they left.

*Q.* Now where were you at the time they walked towards the boat?

*A.* Sitting on the spiral [staircase].

*Q.* And who was with you there?

*A.* Shawn and Cocoa.

*Q.* Was anyone else with you?

*A.* Yeah, a fat girl; but I don't remember her name.

\* \* \*

*Q.* All right. And what happened after James and Chris and Darnita and Omar went towards the boat?

*A.* What happened?

*Q.* Yes, what was the next thing you remember happening?

*A.* They running back towards where we were sitting at.

*Q.* Had you heard anything before you saw them running back towards you?

*A.* Yes.

*Q.* What did you hear?

*A.* Just a little pop.

\* \* \*

*Q.* After the pop did you see anyone?

*A.* Yes.

*Q.* What did you se[e]?

*A.* James and Chris.

*Q.* And what were they doing?

*A.* Running back towards where we were sitting.

*Q.* All right. Did they say anything?

*A.* They said let's go.

*Q.* And what did you do?

*A.* We ran back towards the bus station, bus stop.

\* \* \*

*Q.* Who else did you see get on the bus?
*A.* Shawn, James and Chris.

The prosecution then called Antoinette Simmons, also known as "Shawn."

[*Assistant Prosecutor Foley*]: Did anyone have a gun at any time that night?
[*Antoinette Simmons*]: Yes.
*Q.* Who had a gun?
*A.* James had a gun in the Gouchi bag.
*Q.* In a Gouchi bag?
*A.* Yes.
*Q.* Did you see that gun?
*A.* Earlier that day, yes.

\*    \*    \*

*Q.* Where did you go after you left there?
*A.* We started heading towards Hart Plaza.
*Q.* Was anyone else with you at this time?
*A.* No.
*Q.* Was James Robinson still with you?
*A.* Yes.
*Q.* Omar Frazier[?]
[*A.*] Yes.
*Q.* Was Chris Phillips still with you?
*A.* Yes.
*Q.* And Darnita McGhee?
*A.* Yes.
*Q.* Was Cocoa still with you?
*A.* Yes she was.
*Q.* And was Mimi still with you?
*A.* Yes.
*Q.* Who was Mimi, what is her name?
*A.* Mary Walker.
*Q.* Did you go into Hart Plaza?
*A.* Yes we did.

\*    \*    \*

*Q.* Was there any discussion there what you were going to do?

*A.* Well James, Chris, Omar and Darnita was talking about getting paid that night, they was talking about robbing somebody from the Landsdown boat.

\* \* \*

*Q.* All right. What did they do then?

*A.* We sit there for a minute and then I asked James where [he] was going and he said they was going towards, they was walking towards the Landsdown. I asked him can I go or we got into an argument and we had a little fight.

*Q.* What happened in that fight?

*A.* He slapped me and told I couldn't go.

*Q.* You asked . . . to go with h[i]m?

*A.* Yes I did.

*Q.* What happened after he slapped you and told you you couldn't go?

*A.* They started going towards the boat and I sit there on the street by the spiral staircase.

\* \* \*

*Q.* Who went down towards the Landsdown Restaurant?

*A.* James, Chris, Omar and Darnita.

\* \* \*

*Q.* Who had the gun?

*A.* James still had it in the case.

*Q.* Do you mean you saw the gun or you saw the case?

*A.* I seen the case.

*Q.* James had the case?

*A.* Yes.

*Q.* That was the case in which you had seen the handle of the gun earlier, is that correct?

*A.* Yes.

*Q.* What did you see after you saw James and Darnita and Omar and Chris Phillips walking towards the Landsdown Restaurant?

*A.* Wel[l] next thing I know James and Chris was walking ahead.

*Q.* Walking ahead where?

*A.* Ahead of Darnita and Omar and they was going towards the boat by like it was some [g]ames over there, the basketball game and the crank up, they was around going towards that way.

*Q.* You saw them walking that way?

*A.* Yes.

*Q.* Then what is the next thing you saw?

*A.* I seen Neeta going towar[d]s the water, then they come back up and when they come up it was a white couple in front of them.

*Q.* When you saw them they came up, where did you see them come up, can you point on the sketch where you saw them coming up?

*A.* They was coming up in here.

*Q.* Who was coming up in there?

*A.* James, Chris, Omar, Darnita and a white couple.

\* \* \*

*Q.* Al[l] right. Where was James and Chris in relation to the white couple at that time?

*A.* They was behind him like he was a few feet behind them.

*Q.* All right. Where were Omar and Darnita at that time?

*A.* They was up in this area.

*Q.* Were they on the sidewalk?

*A.* Yes. Kitty-corner on the sidewalk. She was half on the grass and half on the sidewalk.

*Q.* Omar and Darnita were?

*A.* Yes.

\* \* \*

*Q.* And what did you see next?

[*A.*] Well I seen the white couple they split up a little bit and they walked up and all of a sudden the next thing I seen sparks come from the gun and everybody started running.

\* \* \*

*Q.* What happen[e]d after you heard the shots?

*A.* Everybody just started running towards, towards, back towards the spiral staircase.

*Q.* All four of them started running?

*A.* Yes.

*Q.* What happened as they ran towards the spiral staircase?

*A.* Wel[l] when everybody got there James and Tony Quarles switched clothes.

*Q.* What do you mean switched clothes?

*A.* Tony Quarles had a jacket on and James had another. one on. He had a white track suit on and they changed jackets and everybody went towards the bus stop.

\* \* \*

*Q.* . . . And what happened after you got to the bus stop?

*A.* Me, James and Chris got on the bus and went to his sisters house.

*Q.* To whose sisters house?

*A.* James sister.

*Q.* Did you go there directly?

*A.* Yes we did.

The testimony of both Simmons and Walker was impeached by various inconsistent statements they had previously made. Nevertheless, the substance of their testimony was confirmed by the redacted statements of the defendants themselves. Defendant McGhee noted in her statement to the police:

" 'When we got to Hart Plaza everyone kind of split up and walked around . . . . We all met up again at the spiral seats. [T]he talk again was about getting paid. One of my friends told Shawn, you go with them, indicating the girls. And Shawn got mad. There was me and Tony and Cocoa and Mimi and Shawn and three others. One of my friends got real mad and slapped Shawn because she wanted to be with him when they got paid. Cocoa started to calm Shawn down because she was hysterical. . . . One of my friends had a bag, I think it was a designer bag, but I don't know if the gun was in the bag. . . . I could see Cocoa, Shawn

and Mimi near the spiral seats and Tony was further towards Ford Auditorium. . . . One of my friends yelled hook, everyone get the hell out of here. We were all running towards Jefferson. Tony and one of my friends changed coats. Tony gave my friend his blue Georgetown coat and my friend gave Tony his white Georgetown coat.'" [*Ante* at 556-557.]

Defendant Frazier's statement contained the following comments:

" 'About 9:30 P.M., on August 29, 1985, I was [at] the Hart Plaza and met up with members of the Be Like gang around the spiral cement area. I met up with *eight or nine* other persons. One person had a Gucci bag I had sold him earlier and he had a blue steel revolver in the bag. . . . When we finally got to the boat restaurant there was *six* of us.'" [*Ante* at 558. Emphasis added.]

Similarly, in one of the statements that defendant Robinson made to the police he commented as follows:

" 'I got downtown around about nine in the morning. Around about four thirty or five, that's when everybody started meeting up. It was Cocoa, Me, Bop, two girls, `Cocoa and Shawn and two other friends. *It was some more Be Like down there but they was just down there, it was just me, Cocoa, Shawn, Bop and three other friends.* . . . Then we just kept walking towards the festival *people had dulled off and by the time we got to the festival it was just four of us, three friends and me.'* " [*Ante* at 561. Emphasis added.]

Another prosecution witness, Labron Moore, also known as "Bop," testified that a large group of Be Like, perhaps as many as fifty, were downtown on the night in question. His testimony confirms,

however, that before the murder the large group split into two or three smaller groups.

Thus, out of the twenty-odd gang members named at trial, at least three of the defendants, Walker, Simmons and Moore[2] all agree that the group that actually was present at Hart Plaza that night consisted of considerably less than twenty people and probably consisted of no more than eight. Of those eight, Walker and Simmons named only the four defendants as participating in the crime.[3]

There is no doubt that these four defendants had many "friends," several of whom were specifically named at trial. It is also true, with almost a million people living in Detroit, a reference to a "friend" theoretically could be anyone. However, in light of all the evidence and the testimony of Simmons, Walker, and the defendants themselves, it is obvious that the "three friends" the defendants spoke of in their confessions were the very same "friends" sitting alongside them at the defense table.

Also facilitating the ease with which the jury could fill in the blanks is the fact that when a defendant identified a nondefendant admittedly at Hart Plaza (i.e., Simmons, Walker, Cocoa, or Tony), that name was left in. Thus, out of a possible eight, a studious juror could easily exclude the other named individuals, thereby leaving an ever-decreasing number of candidates for the appellation "friend" or "my three friends." Moreover, before allowing the first redacted statement into evidence, the trial court issued the following instructions:

[2] To the extent that Moore testified that the large group divided into smaller groups.

[3] Coincidentally, defendant McGhee's statement places both Simmons and Walker at Hart Plaza, and defendant Robinson's statement places Simmons there.

"What I have ordered the prosecutor to do is to use a fancy lawyers phrase, redact, strike, scratch out. This is going to be done all afternoon.

"Any statement other than [what] is applicable to that individual, if they make any reference to any other names, I said strike it out. I don't want you to guess or speculate, don't consider or worry about it. This is utilized and designed to have you focus first of all whether or not they made the statement and also secondly only as it applies to that individual, if you believe they made the statement and how much of it they made.

"You are going to hear a phrase called my friend. There is [sic] a lot of different names. Don't worry or speculate or my friends, plural if there are more than one person.

\* \* \*

"Understand I meant to say this too, the names struck do not necessarily even reflect the individuals on trial . . . ." [*Ante* at 553, n 8.]

The logical conclusion to the trial court's instruction is that although the names struck do not necessarily refer to the defendants, *they may.* By giving this instruction, the trial court virtually assured that the jurors would make the very connection that it was urging them not to make. This instruction must have inevitably aroused the jurors' curiosity, curiosity that could only be satisfied by filling in the blanks created by the redactions. As I said in my concurrence in *Banks:*

When jurors—presented with a joint trial of several codefendants and a confession by one codefendant which refers to one or more accomplices identified only as "blank"—are pointedly instructed not to consider that confession as evidence against the accomplices on trial with the confessor, it would be almost an insult to their intelligence to suppose that they would not deduce

that the "blanks" are indeed the other defendants.
[*Banks* at 434.]

B

If the situation for defendants Frazier, Phillips
and McGhee was bad, defendant Robinson did not
even enjoy a sporting chance that the jury would
fail to make the connection the court urged it to
avoid. Several nondefendant witnesses identified
defendant Robinson as having a Gucci bag. All the
codefendants' statements referred to one of their
"friends" as having a Gucci bag. Shawn Simmons
also recounted in her testimony that she and
Robinson had an argument and that Robinson
slapped her. In defendant McGhee's redacted state-
ment she says that " '[o]ne of my friends got real
mad and slapped Shawn . . . .' " *Ante* at 556.

To make matters worse, Robinson's sister,
Wanda Mainor, was impeached by a statement she
made to the police. In that statement she said that
Robinson lived with her in August of 1985 and
that he came home late on the night of the mur-
der and was very upset. Simmons testified that
after the shooting, she, Robinson, and Phillips got
on a bus and went to Robinson's sister's house.
Phillips also testified: " 'my friend got off [the bus]
and caught the Livernois bus to his sisters
house.' " *Ante* at 560.

Furthermore, Simmons testified that Robinson
changed coats with Tony Quarles and that Robin-
son was wearing a white coat. McGhee's statement
recounts that " 'Tony gave my friend his blue
Georgetown coat and my friend gave Tony his
white Georgetown coat.' " *Ante* at 557.

It takes a leap of faith to believe that the jury
did not actually know, let alone that a substantial

risk existed, that the "friend" with the sister, the one who carried the Gucci bag, the one who slapped Simmons and changed coats with Tony Quarles, was not James Robinson. And with one piece of the puzzle complete, it is simply a matter to determine who the other "friends" were. Once James Robinson is identified as a "friend," that only leaves two other "friends" to be identified other than the maker of each particular statement.[4]

Having identified one "friend," I think that the risk is very substantial that the jury considered all the codefendants' statements when deciding each defendant's guilt.

C

If at the close of the proofs there were any lingering doubts on the part of the jury regarding who the "friends" were in the redacted confessions, they were surely dispelled by the prosecutor's closing arguments. In those closing arguments, the prosecutor repeatedly urged the jury to consider all the evidence, testimony, and redacted confessions as a whole.

> Now Mr. Cripps [defense attorney] I guess [he] feels that Shawn Simmons is the heart of my case. I must respectfully disagree with him. The heart of my case are James Robinson, Christian Phillips, Omar Frazier and Darnita McGhee. And it is their own words, not someone else's words but their own words . . . . It is their own words which put them in Hart Plaza at this event on August 29, 1985.
>
> * * *
>
> One of the counsel, I believe Miss O'Connell, mentioned that Mrs. Weatherhead did not place anyone on the spiral steps. That's quite true.

---

[4] Excluding Robinson's own statement.

In her testimony she said nothing about anyone being on the spiral steps. But again this is where the defendant's [sic] themselves are the heart of the case and the most damaging evidence against them is spoken by the defendant's themselves.

Omar Frazier admits he met up with eight or nine of the Be Like's [sic] in the spiral cement area.

\* \* \*

So, it is the defendant's themselves who establish the spiral seats as being the place and where the people were sitting.

\* \* \*

But probably the best evidence of the truth of any part of Shawn Simmons statement is the testimony of other defendants and other witnesses. The defendants corroborate the same things that Shawn puts in her statement and puts in her testimony.

\* \* \*

But when you look at all of the stor[i]es and fit them all together, all the important details, they match. They connect. They make a whole, a whole that tells the story.

The prosecutor, by vigorously constructing his case from the evidence established at trial, urged the jury to consider all the confessions as a whole. This is exactly the concern I voiced in my concurring opinion in *Banks*.

I note that Justice GRIFFIN places special emphasis on the fact that the prosecutor's closing argument tended to erode the effectiveness of the redaction. See *ante,* pp 423-427. I fully agree . . . in this regard, but *I would note that this tendency will inevitably exist in every joint trial with one or more superficially redacted codefendant confessions, no matter how conscientious the prosecutor is.* [*Banks* at 435. Emphasis added.]

I believe this case confirms that concern.

### D

I conclude that a substantial risk exists that the jury considered the codefendants' confessions when deciding each respective defendant's guilt contrary to *Banks*. In my opinion, it could not have been any easier for the jury to correctly fill in the blanks with the names of the codefendants, given all the evidence adduced at trial. The record in this case makes it clear that the jury could have easily concluded that the word friend in a codefendant's statement referred to another defendant, because the degree of inference was not sufficiently attenuated.

### II

Having concluded that there is a substantial risk that the jury considered the codefendants' out-of-court statements in deciding each defendant's guilt, *Banks* requires an inquiry into whether that error was harmless beyond a reasonable doubt. An "error is harmless beyond a reasonable doubt" only when the properly admitted evidence of guilt is overwhelming and the prejudicial effect of the codefendant's admission is insignificant. *Id.* at 427. When making this determination, it is proper to consider whether the "average juror" would have found the prosecution's case significantly less persuasive had the confessions been excluded. *Id.* at 430.[5]

---

[5] See also *Schneble v Florida,* 405 US 427, 430; 92 S Ct 1056; 31 L Ed 2d 340 (1972):

> In some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear

I find it difficult to conclude that the error was harmless because the other evidence admitted against these defendants was not "overwhelming," nor was the prejudicial effect of the confession "insignificant." Most witnesses of the shooting reported seeing two or three black males fleeing Hart Plaza; no one got a good look at those fleeing. The victim's companion testified that she and the victim were accosted by two black males, but that she could not positively identify any of the defendants as the two.

Simmons and Walker did positively identify the four defendants as the perpetrators. However, their testimony was so severely impeached that, in absence of defendants' corroborating confessions, their testimony would have been virtually unbelievable. Thus, there were no credible eyewitness identifications of the perpetrators.

Furthermore, even though each statement was admissible against its maker, it must be remembered that no defendant admitted being the actual shooter. All that the defendants actually admitted was either that they were lookouts or that they just happened to be present at the time of the murder. The evidence of each individual's guilt or the extent thereof was not, therefore, overwhelming when judged solely by their confessions. It becomes overwhelming only when all four statements are considered as a whole. When the statements are so considered, as the prosecutor urged during closing arguments, it is obvious that the four acted as a group and that one of the them actually shot Trooper Hutchins. Thus, all could be found guilty under the law of aiding and abetting regardless of who actually pulled the trigger.

beyond a reasonable doubt that the improper use of the admission was harmless error.

It is clear that without the confessions, the prosecution's case would have been "significantly less persuasive" in the mind of the average juror because the confessions were the primary evidence directly linking these defendants to this crime.[6] Therefore, I cannot conclude that the error was harmless beyond a reasonable doubt.

III

After reviewing the entire record in these cases, I conclude that a substantial risk exists that the jury considered the codefendants' confessions when deciding each defendant's guilt. I also conclude that the error in admitting the confessions was not harmless beyond a reasonable doubt because the mind of an average juror, indeed, would have found the prosecution's case significantly less persuasive had the codefendants' statements been excluded. Therefore, I would affirm the decision of the Court of Appeals.

LEVIN, J., concurred with CAVANAGH, C.J.

---

[6] I also note that all the statements, as evidentiary exhibits, were taken into the jury room during deliberations.